JACOB LAVITZ, PLAINTIFF-APPELLANT, v. CIVIL SERVICE COMMISSION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 8, 1958—Decided October 6, 1958.

Before Judges GOLDMANN, CONFORD and FREUND.

*Mr. Harvey Schwartzberg* argued the cause for appellant.

*Mr. David Landau,* Deputy Attorney General, argued the cause for respondent (*Mr. David D. Furman,* Attorney General, attorney).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. This is an appeal under *R. R.* 4:88–8 from the refusal of the Department of Civil Service to admit appellant Jacob Lavitz to an examination for the office of County Welfare Director of Middlesex County because he was not a resident of that county. The essential facts have been stipulated.

Lavitz is a resident of Union County and has been Supervisor of Casework for the Union County Welfare Board for more than 4½ years. On November 1, 1957 the Department of Civil Service announced that an open competitive examination would be held for the position of Director of Welfare, Middlesex County, "open to citizens, 12 months resident in Middlesex County." The examination announcement included the following note: "The Director of Welfare also serves as Director of the Middlesex County Hospital for the Chronically Ill." Lavitz made formal application for the examination, his covering letter stating that the residence restriction was not warranted and requesting admission to the examination. The Department rejected the application because Lavitz was not a resident of Middlesex County.

The parties have also stipulated that each county welfare board fixes and pays compensation for all positions, including that of Director of Welfare, in accordance with the compensation plan it adopts. This plan must be approved by the Division of Welfare, Bureau of Assistance, in the State Department of Institutions and Agencies, in accordance with Ruling No. 11 of the Bureau of Assistance. This ruling was promulgated pursuant to *N. J. S. A.* 44:7–6, its purpose being to set standards justifying approval by the state authorities of the administrative expenses of county welfare boards. Such approval is necessary to qualify a county welfare board for the receipt of state contributions to its activities; the state contributions, in turn, are received by the State from the Federal Government and are subjected to federal auditing.

The single question to be determined is whether an applicant for the position of County Director of Welfare may

legally be required by the Department of Civil Service to be a resident of the county in and for which he will serve. Resolution of the problem involves a consideration of several provisions found in *Revised Statutes, Title* 44 (Poor) and *Title* 11 (Civil Service).

## I.

Preliminarily, we may observe that our welfare legislation evidences a general policy that welfare programs be locally oriented and administered. This is made manifest by a study of the wide range of welfare board programs and duties covered by *Title* 44, portions of *Title* 30, and other statutes, demonstrating that the county, and sometimes the municipality, is made the fundamental welfare unit both from the standpoint of administration and financial responsibility. See, for example, *R. S.* 44:1–1 *et seq.* and 44:4–1 *et seq.,* optional statutes relating to settlement and relief of the poor; *R. S.* 44:5–1 *et seq.,* medical care and hospitalization of the poor by municipalities and counties; *R. S.* 44:6–1 *et seq.,* free dental clinics; *R. S.* 44:7–1 to 35, old age assistance; *N. J. S. A.* 44:7–38 *et seq.,* permanent and total disability assistance. The county, through its welfare board, is required to perform substantial functions in connection with applications for the care or custody of children, *N. J. S. A.* 30:4C–24; the settlement of claims due the welfare board as reimbursement of financial assistance furnished, *N. J. S. A.* 30:5–4.4; home life assistance for dependent children, *N. J. S. A.* 30:5–36 *et seq.;* the administration, under state supervision, of blind relief, *N. J. S. A.* 30:6–3 *et seq.* In Middlesex County, as noted in the Civil Service announcement, the director of welfare also serves as director of the Hospital for the Chronically Ill.

In some welfare programs the State participates little or perhaps not at all. Other programs bring together, under county administration and for use in county institutions or for county residents, substantial federal and state as well as county funds—see, for example, *N. J. S. A.* 44:7–25

(old age assistance); *N. J. S. A.* 44:7–40 (permanent and total disability assistance). These latter programs are carried out under state supervision, *N. J. S. A.* 44:7–6.

Prior to 1931 only two or three counties, but not Middlesex, had adopted the optional provision of *Title* 44, *chapters* 1 and 4; *R. S.* 44:1–1 *et seq.* and 44:4–1 *et seq.* Although not involved in this case, the provisions of *chapter* 4 reveal a consistent legislative pattern and intent of centering county welfare programs in the county welfare board, to be administered through a director of welfare as a county officer. See *R. S.* 44:4–1 ("county welfare board" and "director of welfare" defined); 44:4–11, 20, 24, 26, 30–32, 33, 35, 36, and such sections as *R. S.* 44:4–40, 93, 102, 104, 107 and 120 (enumerating some of the specific duties of the county welfare board and the county director)—all as amended.

The Middlesex County Welfare Board came into existence mandatorily, together with all other counties which had not adopted the provisions of *chapters* 1 or 4 of *Title* 44, by virtue of *L.* 1931, *c.* 219. This act preceded the Federal Social Security Law of 1936 and provided for old age relief on a county-oriented basis. The county welfare board, where it existed, was constituted the county bureau of old age relief, and in counties which had not adopted *chapters* 1 or 4 of *Title* 44, the county welfare board was made mandatory, together with the office of "Director of Old Age Relief." *L.* 1931, *c.* 219, §§ 4, 5.

The 1931 act was repealed by *L.* 1936, *c.* 29, § 1, and was superseded by *L.* 1936, *c.* 31 (*R. S.* 44:7–1 *et seq.*), which was also a mandatory old age assistance statute. This law was one of the several social welfare enactments adopted in 1936. *L.* 1951, *c.* 139 (*N. J. S. A.* 44:7–38 *et seq.*) later added mandatory duties to each county welfare board with respect to permanent and total disability assistance.

*L.* 1936, *c.* 31 (*R. S.* 44:7–1 to 35) was enacted to take advantage of those sections of the Federal Social Security Act which appear as 42 *U. S. C. A.* §§ 301 to 306. A brief review of certain provisions of the 1936 act will give the

statutory framework and policies pertinent to our subsequent discussion of the immediate question here involved.

*R. S.* 44:7–1, as amended, defines county welfare boards as "the boards established within the several counties for the purposes of administering welfare to the needy, whether set up under the authority of this chapter or pursuant to any other laws of this State." The word "assistance" is defined to mean "money payments."

The Federal Social Security Act recognizes that state old age assistance plans may be set up either by designating a single state agency to administer the plan, or by providing for the establishment of a single state agency to supervise the administration of the plan by political subdivisions of the state. 42 *U. S. C. A.* § 302(*a*). Under the act of 1936 (*c.* 31) New Jersey chose merely to supervise the overall plan while designating the county welfare board as the county agency to administer it. See *R. S.* 44:7–6 and 12, as amended. Evidence of this policy may be found in Ruling No. 11 of the Bureau of Assistance, mentioned above, which does not fix salaries and permits each county welfare board to adopt its own compensation plan, the sole limitation being that the board conform to the range schedule set up for some 35 positions.

The federal act insists that personnel standards on a merit basis must be established and maintained. 42 *U. S. C. A.* § 302(*a*)(5). *R. S.* 44:7–11 directed that the county welfare board shall appoint a director of welfare "who shall have the qualifications herein provided." The director was constituted clerk to the welfare board and also its chief executive and approval officer, to serve in these capacities without additional compensation. This section also set out qualifications of the director:

"*He shall be a citizen of the State and of the United States*, shall be able to read and write the English language, and be capable of making and keeping such records and reports as are lawfully required, shall have adequate knowledge of the laws concerning old age assistance and shall be a trained and qualified expert in the field of welfare service, with administrative experience therein." (Italics ours)

*R. S.* 44:7–11 was amended by *L.* 1940, *c.* 186, § 3, which declared that the director of welfare "shall be and hereby is classified in the competitive class of the classified service as defined and provided in Title 11, Civil Service, notwithstanding the county welfare board may not otherwise be operating under the provisions of Title 11, Civil Service." This amendment insured the merit system required by the federal statute. (A similar amendment was made to *R. S.* 44:4–33, relating to the director of welfare, by *L.* 1940, *c.* 187, § 1.)

Under *R. S.* 44:7–24 the county welfare board, with the advice and consent of the State Division of Old Age Assistance, annually fixes and determines "a sum sufficient to pay the estimated amount of the county's proportionate share needed for *old age assistance,*" and reports it to the county freeholder board. Under this section of the law the freeholder board must appropriate the county's proportionate share of such assistance "and make available such amount to the order of the respective county welfare boards, together with a sufficient sum to defray *administrative expenses* to be incurred in connection therewith, * * *." (Italics ours) The final paragraph of *R. S.* 44:7–24, relating to payments, retains this distinction between funds needed for assistance and funds for the administration of assistance by the county welfare board.

*R. S.* 44:7–25, as amended, provides that the State pay to each county welfare board the full amount of any funds received by the State from the Federal Government as federal participation "with respect to *expenditures made by such county welfare board for old age assistance,*" plus an additional amount equal to 75% of the balance of such expenditures after deducting the amount of federal participation. (Italics ours)

It thus appears, with respect to assistance (*i. e.,* "money payments," *N. J. S. A.* 44:7–1), that the statute refers to the county's proportionate share, but with respect to administrative expenses the freeholder board is required to make sufficient funds available. The latter is then partially made

up, not from any state contributions, but from federal funds for expenses incurred in administration by the "local agency administering the State plan in the political subdivision." The federal contribution amounts to 50% of the total of the sums expended for administration in the State. 42 *U. S. C. A.* § 303(*a*)(*B*)(3). The funds so received from the Federal Government are ratably shared by the State Division and the several county welfare boards in proportion to their respective annual approved expenditures for administration of old age assistance. *R. S.* 44:7–27.

A similar financial pattern is exhibited under the law relating to permanent and total disability assistance, *L.* 1951, *c.* 139, as amended; *N. J. S. A.* 44:7–38 *et seq.* Here, again, state and federal subsidies, as provided in *N. J. S. A.* 44:7–40, are given "for assistance." Again the county welfare board is made the basic unit, with reimbursement coming from the State. Here, also, administrative costs are made distinct from costs for assistance. The county and the Federal Government bear the full financial burden for administration; these two, together with the State, share assistance costs.

The general theme underlying appellant's arguments is that the county welfare director holds a state office, and county welfare boards have no local autonomy. In the light of the statutory exposition, both these assumptions are fundamentally wrong. The fact is that the director is a county officer appointed by the county welfare board, receiving a salary fixed and paid by that board which is charged with and performs a number of essential county welfare services, some of these services being partially subsidized through state and federal contributions.

## II.

We now deal directly with appellant's primary argument that the intention of the Legislature was "to establish a state-wide personnel system for the various county welfare boards and not to treat each county welfare board as a separate entity." He asserts that the residence limitation

imposed by the Department of Civil Service "has the effect of granting local autonomy to the county welfare boards." He points to the provision of *N. J. S. A.* 44:7–11 that the county welfare director "shall be a citizen of the State and of the United States," and to the further provision that the director shall be classified in the competitive class of the classified service as defined and provided for in *Title* 11 of the *Revised Statutes* (Civil Service), as evincing a legislative intention to remove the position "from the tentacles of local partisan politics or custom, and obtain the highest and best personnel available." To uphold the action of Civil Service in his case, he maintains, would have the effect of nullifying *N. J. S. A.* 44:7–11.

The Attorney General, defending the position of the Department of Civil Service, argues on the other hand that its action was in accordance with the statutes which require that candidates for the office of county welfare director be initially recruited only from among qualified residents of each county. He contends that controlling significance must be accorded to *R. S.* 11:22–7, which provides that

"For all positions and employments in the classified service, where the service is to be rendered in a particular county, municipality or school district, * * * and payment therefor is made from the funds of such county, municipality or school district, * * * the commission [Civil Service Commission] shall limit the eligibility of applicants to the qualified residents of the county, municipality or school district, * * * in which the service is to be rendered and from the funds of which the employee is to be paid."

### III.

The first question is whether *R. S.* 11:22–7 or *N. J. S. A.* 44:7–11 controls. Appellant would have it that the qualification set out in *N. J. S. A.* 44:7–11 ("citizen of the State and of the United States") is exclusive. While acknowledging that the Legislature also placed the office into the competitive classified service, he apparently conceives that the procedures to be followed were to be independent of those prescribed by Civil Service statute and rule. We reject that interpretation.

*R. S.* 44:7–2 provides, among other things, that

"* * * The provisions contained in this chapter [*Title* 44, *c.* 7; *R. S.* 44:7–1 *et seq.*] shall not be construed to be exclusive and shall not be construed to repeal other provisions of the law not inconsistent therewith. * * * Nothing in this chapter shall operate to repeal or nullify the provisions of *Title* 11, Civil Service."

The minimum qualifications set down by *R. S.* 44:7–11 were in existence when the Legislature determined to bring the county welfare director's office under Civil Service, thus clearly evincing an intention to subject it to all the provisions of *Title* 11, the Civil Service Act, including *R. S.* 11:22–7.

The provisions of the Civil Service Act are positive, clear and all-inclusive, and they should control over those of *N. J. S. A.* 44:7–11 requiring the director to be a citizen of the State. This latter provision does not unequivocally negative the hypothesis that Civil Service might also require an applicant to be a resident of the county in and for which he intends to serve. The provision of *N. J. S. A.* 44:7–11 may simply have been included to prevent non-residents of the State, or residents who are not citizens, from serving as welfare director. On the other hand, *R. S.* 11:22–7 comprehensively and in clear language covers all positions and employments in the classified service, where the service is to be rendered in a particular county and the applicant is to be paid from the funds of that county.

In our view, the qualifications set out in *N. J. S. A.* 44:7–11, including "citizen of the State and of the United States," are minimum qualifications. Were they exclusive, as appellant urges, they would critically curtail the right of the Department of Civil Service to prescribe essential specific qualifications, such as education, minimum years of experience, and the like—as indeed it did here.

The conclusion we have reached on the basis of *R. S.* 11:22–7 is additionally supported by the geographical limitation required by another statute, *R. S.* 40:11–1, which provides, in part, that

"Except as otherwise provided by law, every person holding an office, the authority and duties of which relate to a county only, shall reside within the county, * * *."

## IV.

Appellant insists that *R. S.* 11:22–7 is inapplicable because the county welfare director is not paid from the funds of the county as required by that statute, pointing to the circumstance that a substantial portion of the funds expended by county welfare boards for old age assistance is received from the Federal Government and the State Government, leaving only a small amount to be paid by the county itself —citing *N. J. S. A.* 44:7–25, mentioned earlier in this opinion.

The director's salary is fixed and paid by the county welfare board out of county funds, appropriated by the freeholder board. *R. S.* 44:7–24, 25, 27, as amended; *N. J. S. A.* 44:7–40; 42 *U. S. C. A.* § 303(a)(B)(3). Even though federal grants are provided as partial reimbursement of county administrative expenditures, this does not derogate from nor is it inconsistent with the proposition that the welfare director is being paid out of county funds. There is the additional fact that state and federal aid does not encompass all expenditures made by county welfare boards, so that even if it be argued that part of the funds from which the director is paid are provided by the Federal and State Governments, nevertheless, since he is also in part paid from county funds, his position literally falls under the specification in *R. S.* 11:22–7 of positions and employments in respect to which the employee is paid from county funds.

Appellant also calls attention to the second requirement of *R. S.* 11:22–7, that "the service is to be rendered in a particular county." It cannot seriously be denied that the county welfare director, as chief executive officer of the county welfare board, renders services in his particular county. Indeed, as the Attorney General points out, the entire sweep of the welfare acts so indicates. County welfare

boards have county jurisdiction, and county responsibility. The statutory references cited earlier in this opinion demonstrate that the services rendered by the county board, and therefore by its director, are county-oriented. The fact that an old age assistance recipient may occasionally move to another county for the purpose of receiving care as a patient in a medical institution and, in such case under regulations of the Department of Institutions and Agencies, the county of prior residence is required to assume responsibility for the case, is a consideration of minimal consequence. It does not affect our conclusion that the county welfare director renders services in his particular county.

## V.

Finally, plaintiff contends that in any event the position of county welfare director should be available to all qualified residents of the State if the best personnel available is to be obtained. He reasons that the position is one requiring special training, and it might well happen that a particular county lacked resident applicants having the necessary qualifications and training. In response to this the Attorney General points out that, as construed by the Department of Civil Service, the geographical limitation is invariably lifted when candidates having the minimum qualifications are not available. This policy appears in some degree to be supported by the provisions of *R. S.* 11:23–5, which authorize Civil Service in its judgment to permit non-residents of the State of New Jersey to be admitted to examinations for a position which is of such a character as to require special technical training and specialization in a line of work for which candidates are not readily available, and when advertisement of the availability of the position has failed to produce persons eligible therefor from among the citizens of this State. However that may be, appellant's argument in this connection is addressed to the wisdom and policy of the statute, *R. S.* 11:22–7, rather than to its proper construction. We can deal only with the legislative inten-

tion as evidenced by the statutes themselves, reading them together as a comprehensive whole.

Affirmed.